## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ALIREZA BAKHTIARI

     PLAINTIFF,

     v.

JASON MADRIGAL, *ET AL.*,

     Defendants.

No. 3:18-CV-38

(JUDGE CAPUTO)

(MAGISTRATE JUDGE CARLSON)

## MEMORANDUM

Presently before me is Magistrate Judge Carlson's Report and Recommendation (Doc. 84) to the Motion for Summary Judgment filed byDefendants John Frawley, Linda Forshay, Josiah Martin, and Elissa Wenzel ("PCCF Defendants"). (Doc. 31). For the reasons that follow, the Magistrate Judge's recommendation to grant the Motion in part and deny the Motion in part will be adopted in part and rejected in part.

### I. Background

The relevant background on summary judgment is as follows. On August 7, 2012, Alireza Bakhtiari ("Bakhtiari" or "Plaintiff") pleaded guilty to obstruction of an official proceeding under 18 U.S.C. § 1512(c)(2) and was sentenced to fifty-one (51) months in prison, supervised release, and a one-hundred dollar ($100) fine. (Doc. 32,"Defs.' SMF," ¶ 1; Doc. 56, "Pl.'s SMF," ¶ 1). Removal proceedings were initiated against Bakhtiari by the Department of Homeland Security ("DHS") and Bakhtiari was detained at Pike County Correctional Facility ("PCCF") in early 2017 at the request of ICE following completion of his criminal sentence. (*See* Defs.' SMF ¶ 4; Pl.'s SMF ¶ 4). Upon his arrival at PCCF, Bakhtiari was "classified and placed into level 3 [Maximum-security] general population status[.]" (Doc. 32-1 at 67).

On February 1, 2017, after attempting to collect information from his fellow inmates in the medical department to prepare a class action lawsuit, Bakhtiari was

confronted by Defendants Martin and Frawley.[1] (Doc. 53, Ex. 2 at 4). Bakhtiari was sanctioned to forty-eight (48) days in the Restricted Housing Unit ("RHU") based on this event. (Doc. 32-1 at 48). That same day, Bakhtiari wrote to the PCCF Warden about his concern that he was exposed to Hepatitis C through another inmate, Lee Crawford, who, while serving as the unit orderly, drooled on Bakhtiari's food. (Doc. 53, Ex. 3 at 7). The next day, Bakhtiari again began collecting information from inmates who were interested in pursuing a civil rights class action case against PCCF officials and was sanctioned to twenty (20) days in the RHU in connection with this behavior. (Doc. 53, Ex. 13 at 44). By mid-March of 2017, Bakhtiari filed a grievance concerning his continued isolation, arguing his delayed return to the general prison population was retaliatory after he told a number of PCCF officials he planned to bring a class action against them because their "decisions, conducts, inmate abuse and classifications policies" were unconstitutional. (Doc. 53, Ex. 21 at 70. *See also* Doc. 53, Ex. 20 at 68; Doc. 53, Ex. 22 at 72). On March 17, 2017, Assistant Warden Robert E. McLaughlin denied Bakhtiari's grievance and subsequent appeal, citing his "institutional behavioral history" as a factor influencing the determination. (Ex. 22 at 73).

Upon Bakhtiari's return to the general prison population in March of 2017, Bakhtiari reported his concern about Hepatitis C exposure through Crawford to Defendants Martin and Frawley. (Doc. 53, Ex. 24 at 77). In one grievance addressing this incident, Bakhtiari claims Defendants Martin and Frawley "thr[ew] racial slurs, laughed, ignored & denied" his Hepatitis C concerns. (*Id.*). In a separate grievance about the response to his Hepatitis C concerns, Bakhtiari alleged Defendants Martin

---

[1]     The documentation reflects a dispute of what happened in this confrontation. The record contains contemporaneous accounts by Bakhtiari that Defendants Frawley and Martin physically "assaulted [Bakhtiari] in many ways" during this confrontation. (*E.g.*, Ex. 2 at 4). However, a grievance form pertaining to this incident states Bakhtiari was not physically assaulted in this confrontation, but instead threatened PCCF staff. (Doc. 53, Ex. 4 at 15).

and Frawley "became very hostile and told [him] not to pursue the matter." (Doc. 53, Ex. 26 at 84). On April 4, 2017, the shift commander responded to Bakhtiari's grievances in the following manner: "Prior to working in any positions in the jail all inmates must be cleared by medicals [sic] once proof was brought forward this inmate was removed from his position handling food. The aforementioned supervisors reviewed your claims with medical and at that time they were unfounded." (Ex. 24 at 78). Around this time, Crawford was removed from his position as unit orderly. (Doc. 53, Ex. 28 at 89). Bakhtiari never contracted Hepatitis C in his time at PCCF. (Defs.' SMF ¶ 10; Pl.'s SMF ¶ 10).

On May 11, 2017, Bakhtiari requested to be separated from inmates Gerome G. Johnson and "J. Palmer[,]" claiming they threatened him with physical harm. (Defs.' SMF ¶ 19; Pl.'s SMF ¶ 19; Doc. 53, Ex. 30 at 95; Doc. 32-1 at 50). This request was granted and both individuals were placed on Bakhtiari's separatee list. (Doc. 5 at 22). One month later, on June 12, 2017, Bakhtiari was cleared for administrative segregation housing after he notified Immigration and Customs Enforcement ("ICE") that "he would kill himself if moved from the facility." (Doc. 32-1 at 12. *See also id.* at 13; Defs.' SMF ¶ 26; Pl.'s SMF ¶ 26). By June 21, 2017, Bakhtiari was "placed into protective custody for [his] safety" even though his claims regarding verbal threats were determined to be unfounded. (Doc. 53-1, Ex. 32 at 5).

Defendant Frawley approached Bakhtiari on August 8, 2017 about his attempted contact with a former PCCF officer, Michelle Dotey. (Doc. 53-1, Ex. 52 at 58). Bakhtiari told Defendant Frawley he was working on a pending lawsuit against him on behalf of Dotey, claiming Defendant Frawley previously victimized her both "racially and sexually." (*Id.*). According to Bakhtiari, Defendant Frawley became "irate and began shouting and menacing" and stated "[w]ait till your buddy Johnson comes back, you and him will have a nice reunion!" as he walked away. (*Id.* at 58-59). On September 5, 2017, Frawley informed Bakhtiari that he was being transferred to a cell with Johnson, despite Bakhtiari's pleas. (*Id.* at 59). Once Bakhtiari was in the cell

with the doors locked, Johnson "got up, ready to attack" and Bakhtiari successfully avoided any physical harm by agreeing to help Johnson and his friend with their lawsuit. (Doc. 53-1, Ex. 63 at 85).

At approximately 2:00 a.m. on September 19, 2017, Defendant Martin came into Bakhtiari's cell and took documents relating to the lawsuit concerning abuse claims by former female prison staff that Bakhtiari was working on. (*Id.* at 85; Doc. 5 at 21, 23). Bakhtiari immediately submitted a grievance about this incident. (Doc. 53-1, Ex. 59 at 76). Three hours later, around 5:00 a.m., Defendant Martin returned to Bakhtiari's cell, informing Bakhtiari he received a note suggesting Bakhtiari was suicidal. (*Id.*; Doc. 5 at 21, 23). Defendant Martin strip searched Bakhtiari and made "sexual comments" about his genitals before placing him on suicide watch.[2] (Doc. 53-1, Ex. 61 at 80). Bakhtiari asked Defendant Martin for the suicide note, but Defendant Martin refused to produce it. (*Id.*; Ex. 59 at 76).

On January 5, 2018, Plaintiff filed the instant Complaint against a number of ICE officials and the United States as well as Sgt. John Frawley, Sgt. Forshe, Sgt. Martin,[3] and Elise Wenzel, Correctional Administrator ("PCCF Defendants") alleging a number of civil rights violations and tortious conduct under both Pennsylvania law and the Federal Tort Claims Act ("FTCA").[4] (*See* Doc. 1 *generally*).

---

[2]     Nurse Katie Compton received a sick call slip stating Bakhtiari claimed "[he] want[ed] to hurt [him]self bad" but Bakhtiari denied stating these words. (Doc. 32-1 at 54, 55). The record reflects Bakhtiari was placed on suicide watch and sequestered while he was still naked. (Ex. 61 at 80).

[3]     Plaintiff provided only the following information for these defendants' names: "Forshe (Corr. Sergeant at Pike County Correctional Facility" and "Martin (Corr. Sergeant at Pike County Correctional Facility" in his complaint. (Doc. 1 ¶¶ 10-11).

[4]     Plaintiff's complaint is strangely constructed in that it raises state and federal tort and constitutional claims in the "alternative" of the other, rather than as separate claims. It appears Plaintiff pleads his claims in this manner so that they may proceed regardless of whether the PCCF Defendants are considered federal or

On July 31, 2018 the PCCF Defendants filed a Motion for Summary Judgment on all claims against them. (Doc. 31). On August 29, 2018, the Federal Defendants filed a Motion to Dismiss all claims against them. (Doc. 43). Magistrate Judge Carlson issued a Report and Recommendation on December 27, 2018, recommending that the Federal Defendants' Motion to Dismiss be granted, which I adopted on April 9, 2018. (Doc. 83, Doc. 95, Doc. 96). Magistrate Judge Carlson issued the instant Report and Recommendation as to the PCCF Defendants' Motion for Summary Judgment on January 3, 2019, recommending the Motion be granted in part and denied in part. (*See* Doc. 84 at 48-49). Plaintiff timely filed objections to the Report and Recommendation on January 9, 2019 and the PCCF Defendants filed a response to the objections on February 21, 2019. (Doc. 86; Doc. 99). This matter has therefore been fully briefed and is ripe for disposition.

## II. Legal Standards

### A.  Standard of Review of Objections to a Report and Recommendation

When objections to the magistrate judge's Report are filed, the court must conduct a *de novo* review of the contested portions of the Report. *Sample v. Diecks*, 885 F.2d 1099, 1106 n.3 (3d Cir. 1989) (citing 28 U.S.C. § 636(b)(1)). However, this only applies to the extent that a party's objections are both timely and specific; if objections are merely "general in nature," the court "need not conduct a *de novo* determination." *Goney v. Clark*, 749 F.2d 5, 6-7 (3d Cir. 1984). Indeed, the United States Court of Appeals for the Third Circuit has instructed that "providing a complete *de novo* determination where only a general objection to the report is offered would undermine the efficiency the magistrate system was meant to contribute to the judicial process." *Id*. at 7. In conducting a *de novo* review, the court may accept, reject, or modify, in whole or in part, the factual findings or legal conclusions of the magistrate

state actors. Because the parties did not brief the issue and because I am able to analyze Plaintiff's objections regardless of whether the Defendants are state or federal actors, I need not address Defendants' classifications at this time.

judge. *See* 28 U.S.C. § 636(b)(1); *Owens v. Beard*, 829 F. Supp. 736, 738 (M.D. Pa. 1993). Uncontested portions of the Report may be reviewed at a standard determined by the district court. *See Thomas v. Arn*, 474 U.S. 140, 154 (1985); *Goney*, 749 F.2d at 7. At the very least, the court should review uncontested portions for clear error or manifest injustice. *See*, *e.g.*, *Cruz v. Chater*, 990 F. Supp. 375, 376-77 (M.D. Pa. 1998).

## B.    Summary Judgment

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. *See Edelman v. Comm'r of Soc. Sec.*, 83 F.3d 68, 70 (3d Cir. 1996). Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505. An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id*. Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 251 (3d Cir. 2010). The moving party may present its own evidence or, where the non-moving party has the burden of proof, simply point out to

the court that "the non-moving party has failed to make a sufficient showing on an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256-57. The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177 (1990).

"To prevail on a motion for summary judgment, the non-moving party must show specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial." *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007) (citing Fed. R. Civ. P. 56(e)). "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla." *Id*. (quoting *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S. Ct. 2505.

### III. Discussion

Plaintiff does not object to the Magistrate Judge's recommendation to grant

summary judgment on the following: (1) the access to courts claim;[5] (2) the intentional infliction of emotional distress ("IIED") claim against Defendants Martin, Frawley, and Forshe for their conduct in response to Plaintiff's Hepatitis C complaints in Count I; (3) all claims against Defendant Forshe based on a theory of vicarious liability; and (4) Count XXII, unlawful search and seizure of evidence, in its entirety. (*See* Doc. 84, *generally*). As I find these recommendations are not clearly erroneous, these uncontested portions of the Report and Recommendation will be adopted. Plaintiff also does not object to the Magistrate Judge's recommendation to deny summary judgment on the following: (1) Plaintiff's IIED, First Amendment retaliation, and substantive due process claims against Defendants Martin and Frawley based on the events of September 2017 in Counts I, XVII,[6] and XXI; (2) the assault claim in Count II; (3) the failure to protect claim in Count XIII; and (4) the state-created danger claims against Defendants Martin and Frawley in Count XV. As these portions of the Report and Recommendation are neither clearly erroneous nor contested by the parties, they will be adopted. (*Id.*).

Plaintiff objects to the Magistrate Judge's findings on the following grounds: (1) the Magistrate Judge erred in referring to Plaintiff's solitary confinement as "[d]isciplinary segregation" in discussing the claims arising therefrom; (2) Plaintiff's Hepatitis C conditions of confinement claims should have been analyzed under the

---

[5]     Plaintiff's access to courts claim was not specifically pleaded as such in his complaint, but the Magistrate Judge analyzed this claim anyway based on the parties' briefing. Ultimately, the Magistrate Judge found Plaintiff failed to produce evidence in support of this claim, making summary judgment inappropriate. This determination is not clearly erroneous. (Doc. 84 at 31-35).

[6]     While I adopt the Magistrate Judge's denial of Plaintiff's First Amendment retaliation claims against Defendants Martin and Frawley, Plaintiff may introduce evidence of events which took place prior to September of 2017 to demonstrate the defendants' motivations for their September 2017 actions which form the basis of the claims. (*See* Doc. 1 ¶ 156 ("Defendants took adverse action against the Plaintiff: attempted murder (Frawley), sexual abuse and fabrication of a suicide note[.]")).

"minimal civilized measure of life's necessities" standard; (3) Defendant Martin is not entitled to judgment as a matter of law on Plaintiff's Fourth Amendment strip search claim; (4) the Magistrate Judge erred by limiting his denial of summary judgment on Plaintiff's First Amendment retaliation, due process, or state intentional tort claims to only "specific incidents that took place in September of 2017"; (5) Plaintiff's equal protection claim should survive summary judgment; (6) the Magistrate Judge failed to consider whether the PCCF Defendants' actions are "conscience shocking" for purposes of his substantive due process and IIED claims; (7) Defendants are not entitled to qualified immunity on any of the constitutional tort claims; (8) the Magistrate Judge ignored key facts supported by evidence, namely, the incident on February 1, 2017, Defendants' refusal to act in response to Plaintiff's Hepatitis C concerns, and a "rampant culture of sexual abuse by staff in PCCF."[7] (*See* Doc. 86, *generally*).

In light of these objections, I will review *de novo* whether summary judgment is appropriate on the following claims: (1) solitary confinement against Defendant Wenzel; (2) Hepatitis C conditions of confinement claims against Defendants Martin and Frawley; (3) and the unlawful strip search claim against Defendant Martin in Count XXIII. However, as an initial matter, I will first address Plaintiff's objection to the Magistrate Judge's exclusion of events outside of September of 2017 because the timeframe for Plaintiff's claims affects my summary judgment analysis in the broadest sense.

Plaintiff centers his objection on the Magistrate Judge's failure to consider evidence documenting the alleged incident on February 1, 2017 in his summary

---

[7]     Despite Plaintiff's assertion to the contrary, I find the record does not contain evidence supporting Plaintiff's conclusion of a "rampant culture of sexual abuse" by PCCF staff beyond Plaintiff's individual complaints about the September 19, 2017 strip search; therefore, the Magistrate Judge did not err by failing to consider it.

judgment analysis, arguing this incident supports his retaliation claims against Defendants Martin and Frawley. (Doc. 86 at 3, 4, 8). Defendants argue this incident was properly disregarded because it is not addressed in the Complaint and amounts to a new claim. (Doc. 91 at 9). To the extent Plaintiff seeks to add a new claim on summary judgment through this evidence in lieu of filing an amended complaint, Plaintiff's evidence pertaining to the February 1, 2017 incident will not be considered. *See* Fed. R. Civ. P. 12(c). I will, however, consider evidence of the February 1, 2017 incident insofar as it relates to Plaintiff's existing claims.

## A.    Solitary Confinement

Plaintiff's IIED, First Amendment retaliation, equal protection, and substantive due process claims against Defendant Wenzel are based on Defendant Wenzel's approval and imposition of Plaintiff's disciplinary and administrative confinement.[8] Throughout his tenure at PCCF, Plaintiff spent significant time in the RHU separated from the general prison population. As it pertains to his claims against Defendant Wenzel, Plaintiff was placed in protective custody in February of 2017 for non-compliance, and in administrative custody in  March of 2017 "in accordance with facility classification protocols[,]"  May of 2017 based on his classification status, and in June of 2017 through August of 2017 based on his suicide threat, threats toward staff members, and non-compliance. (Doc. 32-1 at 13, 14, 26, 28-30, 32, 36-37; Doc. 53-1, Ex. 34 at 12; Doc. 53-1, Ex. 36 at 17; Doc. 53-1, Ex. 41 at 31; Doc. 53-1, Ex. 42 at 35; Doc. 53-1, Ex. 56 at 69).

As explained by the Third Circuit, in Pennsylvania correctional facilities, inmates in disciplinary and administrative custody are placed in the RHU. *Shoats v. Horn*, 213 F.3d 140, 142 (3d Cir. 2000). In these facilities, disciplinary custody is imposed when an inmate has been found guilty, following a hearing, of prison

---

[8]    I will refer to this type of confinement as "solitary confinement[,]" as this is the term used by Plaintiff in his objections to the Report and Recommendation.

misconduct and is time-limited. *Id.* Administrative custody, on the other hand, "is used to assure a safe and secure environment for all inmates and staff by separating those inmates whose presence in the general population constitutes a threat to themselves, others, or the safety and security of the institution, or who represent an escape risk." *Id.*

### 1. Due Process

Plaintiff's claim against Defendant Wenzel in Count XXI challenges his placement in solitary confinement as a due process violation. "[T]he touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is . . . the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'" *Wilkinson v. Austin*, 545 U.S. 208, 222, 125 S. Ct. 2384 (2005) (quoting *Sandin v. Conner*, 515 U.S. 472, 484, 115 S. Ct. 2293 (1995)). The Supreme Court has held a liberty interest in freedom from restraint arises when the condition "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 482, 115 S. Ct. at 2300. Placement in solitary confinement does not automatically trigger a liberty interest. *Id.* at 486, 2301. The Third Circuit has adopted a two-factor inquiry for assessing whether a state-created liberty interest arises from solitary confinement: "(1) the duration of the challenged conditions; and (2) whether the conditions overall imposed a significant hardship in relation to the ordinary incidents of prison life." *Williams v. Sec'y Penn. Dep't of Corr.*, 848 F.3d 549, 560 (3d Cir. 2017) (citing *Shoats*, 213 F.3d at 144).

Plaintiff argues he was placed in solitary confinement for the improper purpose of hindering his efforts to pursue legal relief for victims of Hepatitis C exposure and sexual abuse. (Doc. 51 at 8). However, the documentation in the record— including the statements from Plaintiff in connection with his administrative hearings and reviews—shows Plaintiff's solitary confinement was instead imposed due to his classification status, derogatory and threatening comments to PCCF staff, non-

compliance with officer orders and safety rules, and suicide threat.

Moreover, the record reflects Plaintiff's stints in the RHU had predetermined end dates, and were only extended when deemed appropriate by the reviewing officer, often due to Plaintiff's disciplinary infractions and threats toward PCCF staff. (Doc. 32-1 at 13, 14, 26, 28-30, 32, 36-37; Ex. 34 at 12; Ex. 36 at 17; Ex. 41 at 31; Ex. 42 at 35; Ex. 56 at 69). *See Williams*, 848 F.3d at 562 (noting that solitary confinement like that in *Sandin*, where "[t]he duration of the deprivations that follow from that seclusion is often predetermined and fixed unless the inmate's behavior is thought to require an additional period of segregation" does not trigger a liberty interest). Unlike those cases in which the Third Circuit has found a liberty interest may arise from continued solitary confinement over a period of several years, here, the record reflects Plaintiff was released from restrictive confinement to the general population within a matter of weeks or months, depending on the incident.[9] *See id.* at 562-63; *Shoats*, 213 F.3d at 144 ("Based on this record, we have no difficulty concluding that eight years in administrative custody, with no prospect of immediate release in the near future, is "atypical" in relation to the ordinary incidents of prison life[.]").

Because Plaintiff does not challenge any conditions of his restrictive confinement beyond the duration of his confinement, which, as discussed above, does not constitute an "atypical and significant hardship[,]" summary judgment will be granted in favor of Defendant Wenzel on Plaintiff's due process claim.

### 2. First Amendment Retaliation

The First Amendment to the United States Constitution reads in part that "Congress shall make no law . . . abridging the freedom of speech . . .; or the right of the people . . . to petition the government for a redress of grievances." U.S. Const. amend. I. "In order to establish illegal retaliation for engaging in protected conduct,

---

[9]     I also note Plaintiff was released from PCCF in December of 2017, less than one year after his immigration detention began. *Bakhtiari v. Madrigal*, No. 3:18-CV-38, 2019 WL 1531861, at *1 (M.D.Pa. Apr. 9, 2019).

[a plaintiff] must prove that: (1) his conduct was constitutionally protected; (2) he suffered an adverse action at the hands of prison officials; and (3) his constitutionally protected conduct was a substantial or motivating factor in the decision to discipline him." *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016) (footnotes omitted) (citing *Rauser v. Horn*, 241 F.3d 330, 333-34 (3d Cir. 2001)). While causation can be established by direct or circumstantial evidence, "motivation is almost never subject to proof by direct evidence." *Id.* Motivation is thus typically shown by "evidence of either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing that suggests a causal link," *Id.* Even where a plaintiff establishes a *prima facie* case of retaliation, "prison officials may still prevail if they establish that 'they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest.'" *Id.* (quoting *Rauser*, 241 F.3d at 334).

Even assuming Plaintiff's conduct amounts to a constitutionally protected activity and he suffered an adverse reaction in the form of solitary confinement, Plaintiff has not established a *prima facie* case of retaliation, as the evidence does not support a conclusion that Plaintiff's litigious behavior was a substantial or motivating factor in Defendant Wenzel's decision to discipline Plaintiff.

The record reflects Plaintiff was almost constantly soliciting potential plaintiffs or working on lawsuits against the prison. (Doc. 32-1). As such, this claim is one "where the temporal proximity is not so close as to be 'unduly suggestive[,]'" so the proper test for motivation is "timing plus other evidence." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 217, 280 (3d Cir. 2000). Unlike in *Watson*, where the evidence supported a conclusion that Watson's punishment was issued in retaliation for attempting to pursue a grievance against the officers who broke his radio in connection with a cell search, the evidence here supports the conclusion that Plaintiff's conduct accompanying his attempts to prepare lawsuits was a "clear and overt [] violation" and his placement in restrictive confinement was therefore "in furtherance

of legitimate penological goals." 834 F.3d at 426. Among the conduct cited as the basis for Plaintiff's solitary confinement included his threats and derogatory comments to PCCF officers. While Plaintiff denied threatening the officers, he still admitted to insulting Officer Freeswick—to whom he refers to in his disciplinary board statement as "'Officer 'Freesdick'"[10]—by calling him "Jethro, Billy Bob, Toothless Moonshiner and Kentucky inbred." (Ex. 36 at 17). Plaintiff admitted in his disciplinary proceeding concerning the February 1, 2017 incident that his "tone was derogatory and I do recall using the term hillbillies. It was a moment of anger and I regret it." (Doc. 32-1 at 45). Another basis for Plaintiff's continued solitary confinement was his non-compliant behavior, including shaving his head with an electric razor in violation of the "inmate/detainee handbook" which permits electric razors only for shaving facial hair. (Doc. 53-1, Ex. 46 at 45). Plaintiff even admitted that he shaved his head with an electric razor. (*Id.*).

Lastly, Plaintiff must demonstrate Defendant Wenzel's personal involvement, which "'can be shown through allegations of personal direction or of actual knowledge and acquiescence.'" *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)). Plaintiff submitted only two pieces of evidence relating to Defendant Wenzel's personal involvement in Plaintiff's solitary confinement. First, Plaintiff submitted a statement from Defendant Wenzel in his Level II Appeal to the grievance committee about his February 2017 solitary confinement, which states:

> You were administratively segregated due to your non compliant [sic] behavior. Your cell and items were subsequently searched in accordance with facility SOP and both state a federal detention standards. After your items were search to ensure that no contraband was present, your permissible items and legal materials were returned

---

[10] It is unlikely Plaintiff's spelling of Officer Freeswick's name was a typo, as the name "Freesdick" is listed in quotes in Plaintiff's June 23, 2017 summary of events. (Ex. 36 at 17).

to you.

(Doc. 53-1, Ex. 14 at 49). Second, Plaintiff submitted his own March 13, 2017 grievance against Defendant Wenzel stating: "In person I informed Wenzel and other admin that their decisions, conducts, inmate abuse and classification policies are unconstitutional and promised a class action lawsuit. Now in retaliation, I am being denied GP. I shall not eat, you may apply for a force-feeding warrant." (Ex. 21 at 70). At the time Plaintiff submitted this grievance, he was already in solitary confinement based on his inmate classification. (Doc. 32-1 at 67). As such, the record reflects Plaintiff's solitary confinement was based on conduct in violation of prison rules and institutional behavior and was therefore in furtherance of legitimate penological goals. Further, the evidence insufficient to support a finding Defendant Wenzel actually participated in the decision to place Plaintiff in solitary confinement or was motivated by his threats of litigation. Accordingly, summary judgment will be granted in favor of Defendant Wenzel on Plaintiff's First Amendment retaliation claim in Count XVII.

### 3.    Equal Protection

The Equal Protection Clause of the United States Constitution provides: "no state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "To prevail on an equal protection claim, a plaintiff must present evidence that s/he has been treated differently from persons who are similarly situated." *Williams v. Morton*, 343 F.3d 212, 221 (3d Cir. 2003). However, to succeed on an equal protection constitutional tort claim, a plaintiff must show "personal involvement in the alleged wrongs." *Rode*, 845 F.2d at 1207. Personal involvement may be shown through a defendant's personal participation or actual knowledge and acquiescence in the alleged violation. *Simpson v. Horn*, 80 F. Supp. 2d 477, 485 (E.D. Pa. 2000).

Even assuming Plaintiff could demonstrate he was denied equal protection of the laws by his placement in solitary confinement, the evidence does not show Defendant Wenzel's personal involvement in the violation. As discussed above, the only

evidence offered of Defendant Wenzel's personal participation in Plaintiff's solitary confinement is the Level II appeal comment by Defendant Wenzel and Plaintiff's own unsupported allegation of retaliation against her.  (Ex. 14 at 49; Ex. 21 at 70).  In fact, Defendant Wenzel's statement in her Level II appeal response shows she understood that Plaintiff's placement in solitary confinement was based on his "non compliant [sic] behavior."  (Ex. 21 at 70).  There is simply no evidence in the record to even undermine the conclusion that Defendant Wenzel neither knew of nor acquiesced to placing Plaintiff in solitary confinement for reasons other than his non-compliant behavior.  Accordingly, summary judgment will be granted in favor of Defendant Wenzel on Plaintiff's equal protection claim in Count XIX.

### 4. Intentional Infliction of Emotional Distress

To establish a claim for IIED under Pennsylvania law, a plaintiff must show the following: "(1) extreme and outrageous conduct, (2) which is intentional or reckless; (3) it must cause emotional distress, and (4) that distress must be severe."  *Minor v. Cumberland Twp.*, 258 F. Supp. 3d 518, 532 (W.D. Pa. 2017) (citing *Hoy v. Angelone*, 456 Pa. Super. 596, 691 A.2d 476, 482 (1997)).  Because a reasonable jury would be unable to conclude Defendant Wenzel's conduct was extreme or outrageous, I need not address whether it was intentional or reckless, or caused severe emotional distress.

The "extreme and outrageous conduct" standard poses a high bar to clear.  Conduct is "extreme and outrageous" when it is "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'"  *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998) ("*Hoy II*") (quoting *Buczek v. First National Bank of Mifflintown*, 531 A.2d 1122, 1125 (Pa. Super. 1987)).  It is "'reserved by the courts for only the most clearly desperate and ultra extreme conduct.'"  *Bryan v. Erie Cty. Office of Children & Youth*, 861 F. Supp. 2d 553, 585 (W.D. Pa. 2010) (quoting *Hoy*, 720 A.2d at 754).  "The challenged conduct is sufficiently extreme and outrageous when recitation of the facts to an average member of the community would arouse his

resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Id.* at 585-86 (quoting *Kazatsky v. King David Mem'l Park*, 515 Pa. 183, 527 A.2d 988, 994 (Pa. 1987).

The evidence in the record relating to Plaintiff's placement in restrictive confinement does not rise to the level of outrageous conduct. Plaintiff was placed in solitary confinement because of his own suicide threat, threats to PCCF staff, derogatory comments to PCCF staff, non-compliance, and administratively determined classification status. (Doc. 32-1 at 13, 14, 26, 28-30, 32, 36-37; Ex. 34 at 12; Ex. 36 at 17; Ex. 41 at 31; Ex. 42 at 35; Ex. 56 at 69). The record also reflects Plaintiff's solitary confinement was time-limited and periodically reviewed. (*Id.*). Additionally, as discussed above, the evidence is insufficient to support a finding that Defendant Wenzel's conduct amounted to a constitutional violation. For these reasons, no reasonable jury could conclude Defendant Wenzel's conduct was sufficiently outrageous to sustain Plaintiff's IIED claim. Summary judgment will therefore be granted to Defendant Wenzel on Count I.

**B.    Hepatitis C**

Plaintiff challenges the Magistrate Judge's recommendation to grant summary judgment on his substantive due process, deliberate indifference to a medical need, state created danger, and equal protection claims based on Hepatitis C exposure in favor of Defendants Martin and Frawley. Early in his immigration detention, Plaintiff encountered Crawford, a Hepatitis C-positive inmate who worked as a unit orderly and served other inmates their food. Plaintiff experienced anxiety over his potential exposure to Hepatitis C and began reporting his concerns to Defendants Martin and Frawley prior to February 1, 2017. (Ex. 3 at 7). Defendants Martin and Frawley told Plaintiff "the matter is not subject to grievance . . . because it entails another detainee's medical matter." (*Id.*). In Plaintiff's subsequent reports to Defendants Martin and Frawley on this matter, they responded with "racial slurs, laughed, and ignored and denied" Plaintiff's requests to have Crawford no longer handle the food. (Ex. 24 at

77).

On April 4, 2017, when no action had been taken on the issue, Plaintiff filed a grievance and had Crawford confirm his Hepatitis C diagnosis in writing. (Doc. 53, Ex. 25 at 80). The shift commander responding to Plaintiff's grievance defended the actions of Defendants Martin and Frawley, noting Crawford was previously checked by medical staff before being named a unit orderly and that Defendants Martin and Frawley conferred with the medical department after Plaintiff reported his concerns to them and determined "at that time they were unfounded." (Ex. 24 at 78). Plaintiff expressed his dissatisfaction with this response; less than one week later, Crawford was removed from his position and no longer handled inmates' food. (Ex. 28 at 89; Doc. 53, Ex. 29 at 92; Doc. 53, Ex. 37 at 20). Upon his release in December of 2017, Plaintiff tested negative for Hepatitis C. (Defs.' SMF ¶ 10; Pl.'s SMF ¶ 10).

### 1. Substantive Due Process and Deliberate Indifference to a Medical Need

A pretrial detainee challenging the conditions of his confinement must turn to the Due Process Clause for protection. *See Bell v. Wolfish*, 441 U.S. 520, 535 n.16, 99 S. Ct. 1861 (1979); *Hubbard v. Taylor*, 399 F.3d 150, 159-60 (3d Cir. 2005). Immigration detainees are entitled to the same constitutional protections as pretrial detainees. *Adekoya v. Chertoff*, 431 F. App'x 85, 88 (3d Cir. 2011) (per curiam); *Dalhan v. Dep't of Homeland Sec.*, 215 F. App'x 97, 100 (3d Cir. 2007). Since "the Due Process rights of a pre-trial detainee are at least as great as the Eighth Amendment protections available to a convicted prisoner," *Reynolds v. Wagner*, 128 F.3d 166, 173 (3d Cir. 1997) (citation omitted); *see also Bell*, 441 U.S. at 544, 99 S. Ct. at 1877; *City of Revere v. Massachusetts*, 463 U.S. 239, 244, 103 S. Ct. 2979 (1983), the Eighth Amendment sets forth the floor for the standard applicable to the claims of pretrial detainees. *See Bell*, 441 U.S. at 544, 99 S. Ct. at 1877. Thus, a failure of prison officials to provide minimally civil conditions of confinement to pretrial detainees, or deliberate indifference to a serious medical need of such detainees, violates their right

not to be punished without due process of law. *Reynolds*, 128 F.3d at 173-74; *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 345-46 n.31 (3d Cir. 1987). *See also Farmer v. Brennan*, 522 U.S. 825, 114 S. Ct. 1970 (1994); *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285 (1976).

Plaintiff's substantive due process and deliberate indifference to a medical need claims are based on the same facts—the responses, or lack thereof, by Defendants Martin and Frawley Plaintiff's Hepatitis C reports. (*See* Doc. 1 ¶¶ 121-24, 176). Even though Plaintiff's claims are based on the same facts, "[a] separate due process analysis is required" from the deliberate indifference to medical needs analysis under on the Eighth Amendment standard. *Wharton v. Danberg*, 854 F.3d 234, 247 (3d Cir. 2017). However, "'[w]hether one characterizes the treatment received [by the prisoner] as inhumane conditions of confinement, failure to attend to his medical needs, or a combination of both, it is appropriate to apply the 'deliberate indifference' standard articulated in *Estelle*.'" *Wilson v. Seiter*, 509 U.S. 294, 303, 111 S. Ct. 2321 (1991) (citing *Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285 (1976).

### a. Substantive Due Process

To determine whether the conditions of confinement

> are such as to amount to punishment, which would violate the due process rights of pre-trial detainees, we must ask, first, whether any legitimate purposes are served by these conditions, and second, whether these conditions are rationally related to these purposes. In assessing whether the conditions are reasonably related to the assigned purposes, we must, further, inquire as to whether these conditions 'cause [inmates] to endure [such] genuine privations and hardship over an extended period of time,' that the adverse conditions become excessive in relation to the purposes assigned for them.

*Union Cty. Jail Inmates v. Di Buono*, 713 F.2d 984, 992 (3d Cir. 1983) (*quoting Bell*, 441 U.S. at 542, 99 S. Ct. at 1875-76). Exposure to contagious diseases that pose an unreasonable risk of future harm can constitute an inhumane condition of confinement. *See Joy v. Healthcare C.M.S.*, 534 F. Supp. 2d 482, 485 (D. Del. 2008) ("The Supreme Court has recognized that exposure to contagious diseases may violate the Eighth Amendment if prison officials, acting with deliberate indifference, expose a prisoner

to a sufficiently substantial 'risk of serious damage to his future health.'" ) (quoting *Helling v. McKinney*, 509 U.S. 25, 35, 113 S. Ct. 2475 (1993)).  To succeed on such a future injury claim under *Helling*, a plaintiff must show: (1) he was actually exposed to the contagious disease which posed a substantial risk of serious damage to his future health, and (2) the defendants were deliberately indifferent to this risk.  *Atkinson v. Taylor*, 316 F.3d 257, 262 (3d Cir. 2003).[11]

As to the first *Helling* prong, the evidence shows Crawford stated in his April 4, 2017 declaration he "suffer[s] from . . . Hepatitis-C[,]" Crawford drooled on inmates' food while performing his unit orderly duties prior to February 1, 2017, Crawford was not removed from his position as a unit orderly until April of 2017, Crawford's Hepatitis C diagnosis eventually became known to prison officials, Plaintiff learned from Lieutenants Norman and Polinski that PCCF's medical contractor, PrimeCare Inc. mismanaged the retention and communication of Crawford's medical records from his prior institution, and Crawford was removed from his position in early April of 2017.  (Doc. 5 at 10; Ex. 3 at 7; Doc. 53, Ex. 25 at 80; Ex. 26 at 84; Ex. 28 at 88; Ex. 29 at 92).  Drawing all reasonable inferences in favor of Plaintiff, this evidence supports a finding that Plaintiff may have been exposed to Hepatitis C between January and April of 2017 at PCCF.

The record is unclear as to whether this exposure posed a substantial risk of serious damage to Plaintiff's future health.  Plaintiff tested negative for Hepatitis C upon his release from detention and the only health problem the record shows he experienced at the time of exposure was anxiety, which manifested in an elevated heart

---

[11]    Plaintiff argues the proper standard for this claim is "the minimal civilized measure of life's necessities."  (Doc. 86 at 2).  *Young v. Quinlan*, which was cited by Plaintiff in support of this argument, uses this language to explain, generally, what must happen for a prison condition to violate the Eighth Amendment.  960 F.2d 351, 359 (3d Cir. 1992).  This is not inconsistent with the Supreme Court's standard in *Helling*, which is specific to a claim based on exposure to excessive tobacco smoke that causes substantial future harm, or similarly, exposure to contagious diseases.

rate, sweating, shivering, and lack of sleep. (Defs.' SMF ¶ 10; Pl.'s SMF ¶ 10; Ex. 3 at 7). Plaintiff failed to offer expert testimony or other evidence, such as statements by government agencies or prison policies, that could show Plaintiff's exposure to Hepatitis C actually posed a substantial risk of serious damage to his future health or whether "the risk of which he complains is not one that today's society chooses to tolerate." *Helling*, 509 U.S. at 36, 113 S. Ct. at 2482; *see also Atkinson*, 316 F.3d at 265 (finding plaintiff satisfied the first *Helling* prong through expert evidence that concluded plaintiff's risk for death or non-fatal heart attack or stroke would continue to increase in a "smoke filled cell" and the Governor of Delaware's executive order to ban smoking in state buildings).

Even assuming Plaintiff could satisfy the first *Helling* prong, a reasonable jury would be unable to conclude Defendants Martin and Frawley were deliberately indifferent to this serious risk of harm from the evidence provided. *Atkinson*, 316 F.3d at 262. "[A] prison official cannot be found liable . . . for denying an inmate human conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970 (1994). According to Plaintiff's grievances, Plaintiff repeatedly discussed his Hepatitis C concerns with Defendants Martin and Frawley and both men "laughed and ignored & denied" Plaintiff's requests to minimize his exposure and threatened Plaintiff with solitary confinement and assault if he were to further pursue his concerns (Ex. 24 at 77; Ex. 26 at 84; Ex. 27 at 86; Ex. 28 at 89). In one encounter, Defendant Martin told Plaintiff, "[y]ou got Hep-C when you fucked that camel back in [sic] Middle East!" (Ex. 29 at 92). On his April 4, 2017 Informal Inmate Grievance Resolution Form, the shift commander noted, "[t]he aforementioned supervisors reviewed your claims with medical and at that time they were unfounded." (Ex. 24 at 78). The shift commander also explained it is prison policy that "[p]rior to working in any positions in the jail all

inmates must be cleared by medicals [sic]" but that Crawford was removed from his position as unit orderly "once proof was brought froward." (*Id.*).

While the evidence shows Defendants Martin and Frawley took an unfriendly and discouraging tone toward Plaintiff when he addressed his concerns, the record does not support the conclusion that either defendant was aware of facts from which he could have inferred a substantial risk of harm in light of the information provided from the medical department. Instead, the evidence supports the conclusion that neither Defendants Martin nor Defendant Frawley drew the inference that Plaintiff faced a substantial risk of harm from exposure to Hepatitis C and had no reason to distrust the information provided by the medical department until the records mismanagement problem came to light. Once PCCF officials learned of the records mismanagement, Crawford was promptly removed from his position and no longer handled Plaintiff's food. Because the evidence does not support a finding that Defendants Martin or Frawley acted with deliberate indifference toward a substantial risk of future harm to Plaintiff, summary judgment will be granted in favor of Defendants Martin and Frawley on Plaintiff's substantive due process claim based on exposure to Hepatitis C in Count XXI.

### b. Deliberate Indifference to a Medical Need

To establish a due process claim based on deliberate indifference to a medical need, a plaintiff must show "(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003); *see also Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999); *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) ("[I]t would be anomalous to afford a pretrial detainee less constitutional protection than one who has been convicted. Thus, at a minimum the 'deliberate indifference' standard of *Estelle v. Gamble*, must be met.") (citations omitted). A prison official acts with deliberate indifference to an inmate's serious medical needs when he "knows of and disregards an excessive risk to inmate health or

safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw that inference." *Farmer*, 511 U.S. at 837, 114 S. Ct. at 1979 . A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm. *Id.* at 857, 114 S.Ct. at 1989.

The record does not establish Plaintiff has a serious medical need. "A medical need is 'serious,' in satisfaction of the second prong of the *Estelle* test, if it is 'one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (citing *Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285 (1976)). Though exposure to Hepatitis C could form the basis of a conditions of confinement based on future harm claim, a deliberate indifference to medical needs claim based on *present* harm requires "deliberate[] indifferen[ce] to a prisoner's *existing* serious medical needs[,]" and requires more than mere exposure. *Atkinson*, 316 F.3d at 266 (emphasis added); *see also Crocamo v. Hudson Cty. Corr. Ctr.*, No. 06-1441, 2007 WL 1175753, at *7 (D.N.J. Apr. 19, 2007) (dismissing plaintiffs' claim because they failed to allege an actual injury after conceding they did not contract Hepatitis despite their exposure to the disease). Notably, Plaintiff did not contract Hepatitis C while at PCCF. (Defs.' SMF ¶ 10; Pl.'s SMF ¶ 10). Plaintiff's mere exposure to Hepatitis C therefore does not constitute a serious medical need.

The only then-present health concern Plaintiff complained of relating to exposure to Hepatitis C was anxiety. (Defs.' SMF ¶ 10; Pl.'s SMF ¶10; Ex. 3 at 7). It is unclear from the record whether Plaintiff informed Defendants Martin and Frawley of his anxiety when informing them of his concerns about Hepatitis C exposure, as Plaintiff's grievances only separately mention he reported his concerns to Defendants Martin and Frawley and that he experienced anxiety. (*See, e.g.*, Ex. 3 at 7; Ex. 24 at 77; Ex. 25 at 80). Additionally, no evidence was submitted suggesting

Plaintiff received or even sought treatment by the medical staff for anxiety or that his symptoms were so obvious that other inmates or prison officials actually recognized or could have recognized Plaintiff's need for anxiety treatment. Accordingly, the record cannot support a conclusion that the only actual harm Plaintiff suffered, anxiety, was either diagnosed by a physician or sufficiently obvious that a lay person would easily recognize the need for medical attention. Summary judgment will therefore be granted in favor of Defendants Martin and Frawley on Plaintiff's deliberate indifference to medical needs claim in Count XI based on Plaintiff's inability to establish a serious medical need.

### 2. State-Created Danger

In *Kneipp v. Tedder*, 95 F.3d 1199, 1201 (3d Cir. 1996), the Third Circuit first adopted the state-created danger theory as a mechanism by which plaintiffs may establish constitutional violations under 42 U.S.C. § 1983 if an individual incurs harm as a direct result of certain state actions. Such "liability may attach where the state acts to *create* or *enhance* a danger that deprives a plaintiff of his or her Fourteenth Amendment rights to substantive due process." *Morrow v. Balaski*, 719 F.3d 160, 177 (3d Cir. 2013) (emphasis in original). To prevail on a state-created danger claim, a plaintiff must show:

(1) The harm ultimately caused was foreseeable and fairly direct;

(2) A state actor acted with a degree of culpability that shocks the conscience;

(3) A relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and

(4) A state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Bright v. Westmoreland Cty.*, 443 F.3d 276, 281 (3d Cir. 2006) (footnotes omitted).

As discussed above, Plaintiff has not shown that he suffered any harm from

being exposed to Hepatitis C except for anxiety. Even assuming Plaintiff's anxiety can constitute sufficient harm under the *Bright* state-created danger standard, he cannot show the actions of Defendants Martin and Frawley shocked the conscience, or the necessary causation.

To succeed on a state-created danger claim, a plaintiff must show more than just an omission by a state actor, he must demonstrate an affirmative act. *See Kaucher v. Cty. of Bucks*, 455 F.3d 418, 432 (3d Cir. 2006) (explaining the fourth *Bright* prong requires an affirmative act, "'misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause'") (quoting *Bright*, 443 F.3d at 282). In his Complaint, Plaintiff alleges Defendants Martin and Frawley "knowingly plac[ed] an individual with Hepatitis C in charge of food services and in charge of the meal trays and then ignoring plaintiff's notices of the danger[.]" (Doc. 1 ¶ 140). Plaintiff has not offered evidence supporting his allegation that Defendants Martin and Frawley personally decided to make Crawford a unit orderly, much less evidence that they knew about Crawford's Hepatitis C status at that time. The evidence does show, however, Defendants Martin and Frawley were hostile and dismissive in response to Plaintiff's concerns about Hepatitis C exposure for several months, but that they nevertheless checked with the medical department about the veracity of these concerns. (Ex. 24 at 77-78). Still, the evidence does not show this conduct toward Plaintiff "was the but for cause of the danger" Plaintiff faced. *Kaucher*, 455 F.3d at 432 (internal citations omitted). To the extent Plaintiff was actually exposed to Hepatitis C through Crawford's bodily fluids, this exposure likely occurred before Plaintiff reported his concerns to Defendants Martin and Frawley for the first time, as he informed them about Crawford's drooling after-the-fact. *See Tittensor v. Cty. of Montgomery of Com. of Pennsylvania*, No. 02-CV-8011, 2003 WL 22358450, at *4 (E.D. Pa. Sept. 9, 2003) ("Even if the government defendants failed to respond adequately to the outbreak, that failure did not create the danger of contracting E. coli. The bacteria was already present.").

Moreover, the evidence does not show the failure of Defendants Martin and Frawley to take action for several months after Plaintiff reported his concern about Hepatitis C exposure, specifically, removing Crawford from his position, was conscience shocking.

> Because the "exact degree of wrongfulness necessary to reach the 'conscience-shocking' level depends upon the circumstances of a particular case," *Miller v. City of Philadelphia*, 174 F.3d 368, 375 (3d Cir. 1999), we evaluate the conditions under which a defendant acted in order to ascertain the relevant standard of culpability[. . .]. Where a defendant is "confronted with a hyperpressurized environment such as a high-speed chase . . . it is usually necessary to show that the officer deliberately harmed the victim." *Estate of Smith v. Marasco* (*Smith II*), 430 F.3d 140, 153 (3d Cir. 2005) (quotations and citations omitted). Where a defendant has "the luxury of proceeding in a deliberate fashion . . . deliberate indifference may be sufficient to shock the conscience." *Id.* (quotations and citations omitted) [. . . ]. Where a defendant has to act with some urgency, but does not have a make split-second decisions—such as when a social worker attempts to remove a child from the parents' custody—the defendant's actions must "reach a level of gross negligence or arbitrariness that indeed 'shocks the conscience.'" *Miller*, 174 F.3d at 375-76[.]

*Kaucher*, 455 F.3d at 426. As in *Kaucher*, which also concerned a prison's response to a contagious disease, the appropriate standard in the instant case for determining whether the actions of Defendants Martin and Frawley were conscious shocking is deliberate indifference. *Id.*; *see also Farmer*, 511 U.S. at 837, 114 S. Ct. at 1979. As previously discussed, the evidence shows Defendants Martin and Frawley did not know of Crawford's Hepatitis C status at the time they responded in a hostile and dismissive attitude toward Plaintiff's complaints, as they consulted with the medical department about Plaintiff's Hepatitis C reports and were informed these concerns were "unfounded[.]" (Ex. 24 at 77-78). In light of the information from the medical department, the evidence does not establish facts from which Defendants Martin and Frawley could have inferred faced a substantial risk of exposure to Hepatitis C. Accordingly, summary judgment will be granted in favor of Defendants Martin and Frawley on Plaintiff's state-created danger claim in Count XV.

**3. Equal Protection**

A plaintiff may bring an equal protection claim under two legal theories. In a traditional case brought under the Equal Protection Clause, an inmate asserts a defendant treated him differently from other similarly situated individuals because of his membership in an identifiable or protected class, such as race, religion, sex, or national origin. *Mack v. Warden Loretto FCI*, 839 F.3d 286, 305 n.112 (3d Cir. 2016). In a "class of one" equal protection claim, a plaintiff does not allege discrimination based on membership in a protected class or particular group but instead asserts the defendant treated him differently from others similarly situated for arbitrary or irrational reasons. *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 243 (3d Cir. 2008). *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073 (2000).

Plaintiff appears to raise both a traditional equal protection claim on the basis of his national origin and a class of one equal protection claim. Specifically, Plaintiff claims Defendants Martin and Frawley decided not to take action on Plaintiff's reports of potential Hepatitis C exposure because of his national origin. (Doc. 1 ¶ 169). Plaintiff submitted evidence that Defendants Martin and Frawley responded to a number of Plaintiff's Hepatitis C reports with xenophobic slurs, including Defendant Martin's statement that "[Plaintiff] got HC when [Plaintiff] fucked that camel!" and Defendant Frawley's statement that "[Plaintiff] got HC back in that third world country [Plaintiff] came from!" (Doc. 53, Ex. 27 at 87). This evidence, without more, is insufficient to show Plaintiff was treated differently from other similarly situated individuals, a requirement for traditional and class of one equal protection claims. The record is entirely devoid of evidence relating to how Defendants Martin and Frawley treated other inmates, let alone inmates who were similarly situated to Plaintiff. *See Overly v. Garman*, 500 F. App'x 42, 43 (3d Cir. 2015) (dismissing equal protection claim where Plaintiff failed to "make allegations regarding the treatment of any other inmates" and instead "merely note[d] that *he* was treated differently) (emphasis in original); *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006) (dismissing class of one equal protection claim because plaintiff did not "allege the existence of

similarly situated individuals—i.e., Borough Managers—who [defendant] treated differently than he treated [plaintiff]).  For this reason, summary judgment will be granted on Plaintiff's equal protection claim in Count XIX.

## C.    Strip Search

Plaintiff also objects to the Magistrate Judge's recommendation to grant summary judgment for Defendant Martin on his strip search claim in Count XXIII of the Complaint.  In particular, Plaintiff objects to the accuracy of the Magistrate Judge's Fourth Amendment analysis and failure to analyze the strip search claim under the Eighth Amendment.  (Doc. 86 at 2).

Around 2:00 a.m. on September 19, 2017, Defendant Martin came to Plaintiff's cell, looked around, and confiscated a number of Plaintiff's litigation files, including documents relating to a sexual harassment suit by former PCCF employees against the prison.  (Ex. 59 at 76; Doc. 53-1, Ex. 60 at 78; Doc. 53-1, Ex. 63 at 86).  Plaintiff quickly submitted a grievance following this event.  (Ex. 59 at 76).  Around 5:00 a.m. that same morning, after Plaintiff's grievance was submitted, Defendant Martin returned to Plaintiff's cell claiming Plaintiff reported he was suicidal, strip searched him, and placed him under suicide watch.  (*Id.* at 76; Ex. 61 at 80; Ex. 63 at 86; Doc. 32-1 at 54).  Defendant Martin wrote in a memorandum that prior to returning to Plaintiff's cell that morning, he received a call from Nurse Compton informing him she obtained a sick call slip indicating Defendant Martin wanted to hurt himself.[12]  (Doc. 32-1 at 54).  According to Plaintiff, Defendant Martin "stripped [Plaintiff] fully bare" and "made sexual comments about [Plaintiff's] genitals" before placing him under

---

[12]    In her incident report, Nurse Compton wrote she obtained the "sick call slip from medical box."  (Doc. 32-1 at 55).  According to Nurse Compton, "the patient wrote 'I want to hurt myself bad.'" (*Id.*).  According to Defendant Martin, Plaintiff stated "I feel like hurting myself bad."  (*Id.* at 54).

suicide watch "fully nude." (Ex. 59 at 76; Ex. 61 at 80; Ex. 63 at 86).[13] Plaintiff denied that he was suicidal and that he wrote a suicide note. (Doc. 32-1 at 54, 55). When Plaintiff asked Defendant Martin if he could see the suicide note, Defendant Martin refused to show the sick call slip to him, saying "No son! That shit is top secret!" (Ex. 61 at 80; Ex. 63 at 86).

### 1. Fourth Amendment

The Fourth Amendment to the United States Constitution, as incorporated to the states through the Fourteenth Amendment, protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. In *Parkell v. Danberg*, 833 F.3d 313, 324-25 (3d Cir. 2016), the Third Circuit held that the Fourth Amendment "grants inmates a limited right of bodily privacy, subject to reasonable intrusions necessitated by the prison setting." The *Parkell* court emphasized that while the Fourth Amendment "applies to bodily searches in prison," the "contours of prisoners' Fourth Amendment rights" are "very narrow." *Id.* at 326. Application of the Fourth Amendment in this context requires a balancing of interests. *See id.*

> "The test of reasonableness under the Fourth Amendment . . . requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." *Bell* [*v. Wolfish*, 441 U.S. 520, 559, 99 S. Ct. 1861(1979)]. "Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* Inmate search policies are constitutional if they "strike a reasonable balance between inmate privacy and the needs of the institutions." *Florence* [*v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 339, 132 S. Ct. 1510 (2010) ("*Florence II*")].

---

[13]    Contrary to the conclusions by the Magistrate Judge, while the record contains consent forms for other strip searches conducted over the course of Plaintiff's detention, the record does not contain a consent form for the strip search performed on September 19, 2017. (Doc. 32-1 at 17, 20, 23, 56). Additionally, looking to Plaintiff's allegations in his Complaint and the evidence provided, Plaintiff's strip search claim is based only on this particular incident. (Doc. 1 ¶ 186).

> In balancing those interests in the prison context, we must give considerable weight to the "place in which [the search is conducted]" — prisons being "places of involuntary confinement of persons who have a demonstrated proclivity for antisocial, criminal, and often violent conduct," *Hudson* [*v. Palmer*, 468 U.S. 517, 526, 104 S. Ct. 3194 (1984)]— and considerable deference to "the justification for initiating it." *Bell*, 441 U.S. at 559, 99 S. Ct. 1861. "[C]orrectional officers must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities." *Florence II*, [566 U.S. at 328, 132 S. Ct. 1510]. A regulation "impinging on an inmate's constitutional rights must be upheld if it is reasonably related to legitimate penological interests." *Id.* at [326, 132 S. Ct. 1510] (quotation marks omitted). We recognize that "[t]he task of determining whether a policy is reasonably related to legitimate security interests is peculiarly within the province and professional expertise of corrections officials." *Id.* at [328, 132 S. Ct. 1510] (quotation marks omitted). Unless there is "substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations courts should ordinarily defer to their expert judgment in such matters." *Id.* (quotation marks omitted).

*Parkell*, 833 F.3d at 326. This particular balancing test applies specifically to visual body-cavity searches,[14] whereas "other more or less intrusive types of bodily searches . . . entail a different balancing of interests." *Id.* at 327. Still, "even strip searches 'less intrusive than . . . visual body-cavity searches' are an 'extreme intrusion on privacy.'" *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 621 F.3d 296, 307 (3d Cir. 2010) ("*Florence I*"). A number of courts have determined a strip search performed in an "abusive fashion" may violate the Fourth Amendment. *Bell*, 441 U.S. at 560, 99 S. Ct. at 1885 ("[O]n occasion a security guard may conduct the search in an abusive fashion. Such an abuse cannot be condoned.") (citation omitted); *see also Watson v. Sec'y Pa. Dep't of Corr.*, 436 F. App'x 131, 136 ("The intrusive and humiliating nature of [a search including physical touch and sexual comments], conducted on an arbitrary basis, calls into question its reasonableness and, thus, its constitutionality.")

---

14      According to the Third Circuit, "[a] visual body cavity search extends to visual inspection of the anal and genital areas' and '[a] manual body cavity search includes some degree of touching or probing of body cavities.'" *Id.* at 327 (quoting *Blackburn v. Snow*, 771 F.2d 556, 561 n.3 (1st Cir. 1985)).

The record reflects a dispute as to the justification for the strip search. However, documentation from Defendant Martin and Nurse Compton indicates the strip search was performed in response to Plaintiff's alleged suicide threat. (Doc. 32-1 at 54, 55). However, this same documentation acknowledges that Plaintiff denied having made this suicide threat. (*Id.*). Indeed, Plaintiff offered evidence to support his argument that Defendant Martin created this suicide note, including: Plaintiff's numerous denials of having submitted that suicide threat, the close temporal proximity between Defendant Martin's initial search of Plaintiff's cell in which he confiscated legal materials, Defendant Martin's refusal to produce the alleged suicide note upon Plaintiff's request, and the fact that Nurse Compton did not receive the suicide note directly from Plaintiff, but instead received it through a slip in the medical box. (Ex. 59 at 76; Ex. 61 at 80; Ex. 63 at 86).

Thus, a genuine dispute of material fact exists as to whether Defendant Martin knew Plaintiff was not suicidal and did not submit the medical slip at the time of the strip search. *See Parkell*, 833 F.3d at 326 (stating deference to the corrections officer is not warranted where there is substantial evidence the officer's response was "exaggerated"); *McMillan v. Hughes*, No. 17-13435, 2018 WL 3945467, at *6 (D.N.J. Aug. 16, 2018) (concluding a claim alleging corrections officers "made degrading comments about [plaintiff's] body and threatened him during a strip search" could survive a motion to dismiss); *Brown v. Graham*, No. 9:07-CV-1353, 2010 WL 6428251, at *14 (N.D.N.Y. Mar. 30, 2010) (denying summary judgment on a Fourth Amendment strip search claim based on an alleged suicide threat where plaintiff failed to allege or offer evidence "indicating that any such search was conducted with an intent to intimidate, harass, or punish plaintiff, rather than with the intention to ensure his safety by confiscating any items which might be used to inflict self-harm"). Accordingly, Plaintiff's objection to the Magistrate Judge's conclusion on this issue is sustained and summary judgment will be denied on the Fourth Amendment claim

against Defendant Martin in Count XXIII.[15]

### 2. Eighth Amendment

Visual-body cavity searches constitute cruel and unusual punishment in violation of the Eighth Amendment only when "they are 'undertaken maliciously or for the purposes of sexually abusing an inmate." *Id.* at 335 (quoting *Crawford v. Cuomo*, 796 F.3d 252, 258 (3d Cir. 2015)). The Eighth Amendment standard was further defined in *Ricks v. Shover*, 891 F.3d 468 (3d Cir. 2018), in the context of sexual abuse claims.[16] Drawing on the Supreme Court's framework for excessive force claims in *Hudson v. McMillan*, 503 U.S. 1, 8, 112 S. Ct. 995 (1992), the *Ricks* court rejected a broad reading of *Crawford* and instead found a plaintiff must satisfy both an objective and

---

[15]    I decline to engage in a qualified immunity analysis on this issue because of the genuine dispute of material fact. *Cf. Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir. 1995) ("When the material facts are not in dispute, the district court may decide whether a governmental official is shielded by qualified immunity as a matter of law.").

[16]    The Third Circuit's discussion of its new standard in *Ricks* involves physical touching by a prison official against an inmate. *See, e.g.*, *Id.* at 475 ("When deciding objective harm, 'not . . . every malevolent *touch* by a prison guard gives rise to a federal cause of action.'") (emphasis added) (quoting *Hudson*, 503 U.S. at 9, 112 S. Ct. at 1000). The evidence presented in instant case, however, does not involve a sexualized touching beyond that which is incidental to a strip search; instead, the evidence shows only verbal harassment by Defendant Martin concurrently with the strip search. (Ex. 59 at 76; Ex. 61 at 80; Ex. 63 at 86). While *Ricks* specifically addresses when a strip search that involves sexual touching may violate the Eighth Amendment, the Court's discussion in *Parkell*, utilizing "or[,]" suggests sexual touching is not necessary for establishing an Eighth Amendment violation. *See Parkell*, 833 F.3d at 335 (strip searches will not violate the Eighth Amendment unless they are "'undertaken maliciously **or** for the purposes of sexually abusing an inmate'") (emphasis added) (quoting *Crawford*, 796 F.3d at 258). *But see Armstrong v. Diraimo*, No. 17-237, 2018 WL 6788524, at *4 (W.D. Pa. Dec. 26, 2018) ("'[S]exual harassment in the absence of contact or touching does not establish an Eighth Amendment violation . . . . Verbal harassment, including lewd comments, sexual propositioning, and the like, is not sufficient to satisfy the objective element of an Eighth Amendment sexual harassment claim.'") (quoting *McCain v. Wetzel*, No. 17-184, 1018 WL 1211507, at *3 (W.D. Pa. Mar. 8, 2018)).

subjective prong to prevail on an Eighth Amendment sexual abuse claim. *Ricks*, 891 F.3d at 475. Thus, the "incident must be objectively, sufficiently intolerable and cruel, capable of causing harm, and the official must have a culpable state of mind." *Id.*

The subjective prong requires an inquiry into whether the official "had a legitimate penological purpose or if he or she acted 'maliciously and sadistically for the very purpose of causing harm.'" *Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 319-20, 106 S. Ct 1078 (1986)).

> Absent a legitimate penological purpose, the type of touching involved in, for instance, a body-cavity search, would be undoubtedly cruel and unusual. And a desire to humiliate the inmate or gratify the officer—inferred through the officer's conduct—is a reasonable way to distinguish between invasive touching that is permitted by law to ensure safety and that which is not. An analysis focused on the intent of the officer is therefore appropriate when evaluating whether an objectively intrusive search is constitutional.
>
> We have previously discussed this distinction as it pertains to claims for unconstitutional prison conditions. In *Parkell v. Danberg*, where an inmate was "subjected to thrice-daily visual body-cavity searches," we concluded that those searches would only be cruel and unusual if they were "undertaken maliciously or for the purposes of sexually abusing" the plaintiff. 833 F.3d 313, 335-36 (3d Cir. 2016) (quoting *Crawford*, 796 F.3d at 258). We found a focus on intent necessary to demarcate permissible from *ultra vires* invasiveness.

*Id.* at 476.

As discussed above, the record contains a genuine dispute of material fact concerning Defendant Martin's awareness that Plaintiff was neither suicidal nor submitted the medical slip concerning suicide. Resolution of this dispute is needed to determine whether Defendant Martin possessed the requisite intent. However, Plaintiff must also satisfy the objective prong to survive summary judgment on this claim. *See id.* ("[T]he inquiry to define culpable state of mind versus legitimate penological purpose is a necessary, but not sufficient, inquiry.").

The objective prong is "'contextual and responsive to contemporary standards of decency.'" *Id.* (quoting *Hudson*, 503 U.S. at 8, 112 S. Ct. at 1000). Because "this inquiry is necessarily contextual, fact-specific, and to be conducted in the first instance by the District Court[,]" the Third Circuit declined to "craft a mechanical factors test

for when sexual contact is objectively, sufficiently serious." *Id.* at 478.  Yet, "[t]he scope, place, and timing of the offensive conduct will bear on its severity, as will the details of the alleged contact." *Id.*

Even though the record supports an inference of physical contact by Defendant Martin incident to performing the strip search, Plaintiff has not satisfied his burden of demonstrating objective seriousness.  Indeed, Defendant Martin's comments about Plaintiff's genitalia—as established only through Plaintiff's general recollections given that no evidence was offered as to the specific content of these comments— is the only purportedly cruel and unusual element to the strip search.  A survey of decisions by other courts analyzing Eighth Amendment sexual abuse claims reveals Defendant Martin's conduct, though undoubtedly inappropriate, uncomfortable, and unprofessional, simply cannot rise to the level of a constitutional violation, especially when more egregious circumstances were adjudged constitutionally insufficient. *E.g.*, *McIntyre v. Kellinger*, 741 F. App'x 891, 892-93 (3d Cir. 2018) (concluding incident in which defendant dragged his hands down plaintiff's buttocks, gripped his buttocks, patted his thighs, and "squeezed [his] ass as if [he] was a woman" while whispering "in a sexual manner" during a pat-down search was not objectively severe or serious under the Eighth Amendment); *Ricks*, 891 F.3d at 479 (suggesting an "isolated, momentary" incident in which guard "rubbed his erect penis against [plaintiff's] buttocks through both men's clothing" was not sufficiently severe, but permitting amendment); *Washington v. Harris*, 186 F. App'x 865, 866 (11th Cir. 2006) (concluding inmate failed to state Eighth Amendment claim where a prison guard "crept up behind [the prisoner inmate] while he was working," grabbed his genitals, kissed him on the mouth, and threatened to perform oral sex on him); *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997) (concluding conduct involving female corrections who officer squeezed plaintiff's penis, said "[Y]ou know [you're] a sexy black devil, I like you," bumped into plaintiff with her breasts, and pinned him against the wall "with her whole body vagina against penis" were not sufficiently serious); *Armstrong*, 2018 WL

6788524, at *1 (granting summary judgment in favor of defendant who, during a random pat-down search, "placed his hands inside Plaintiff's boxer shorts, stroked his penis once, and grabbed his scrotum," and commented "I do what the fuck I want" and "I felt bigger"); *Waston v. Wingard*, No. 3:16-CV-00055, 2018 WL 2108316, at *1 (W.D. Pa. Jan. 31, 2018) (finding conduct involving defendant who gave plaintiff an "upper cut" to the groin with his forearm, "groped and massaged [his] penis," and examined plaintiff's "butt . . . like a doctor" did not amount to sexual abuse); *Harris v. Zappan*, No. CIV A 97-4957, 1999 WL 360203, at *4-*5 (E.D. Pa. May 28, 1999) (determining allegations of one instance of sexually explicit comments combined with fondling and rubbing on thighs and breasts was not sufficiently serious). Accordingly, summary judgment will be granted in favor of Defendant Martin on Plaintiff's Eighth Amendment strip search claim in Count XXIII.

## IV. Conclusion

For the above stated reasons, the Magistrate Judge's Report and Recommendation will be adopted in part and rejected in part as follows. Summary judgment will be granted in favor Defendants Forshe and Wenzel on all claims against them, in favor of Defendants Martin and Frawley on all claims arising from Plaintiff's exposure to Hepatitis C, and in favor of Defendant Martin on Plaintiff's Eighth Amendment strip search claim. Summary judgment will be denied on all other claims. Accordingly, the following claims against Defendant Martin based on events relating to the September 19, 2017 strip search will survive summary judgment: (1) Count I (IIED); (2) Count II (assault); (3) Count XV (state-created danger); (4) Count XVII (First Amendment retaliation); (5) Count XXI (substantive due process); and (6) Count XXIII (Fourth Amendment strip search). The following claims against Defendant Frawley based on events relating to Plaintiff's cell assignment in September of 2017 will survive summary judgment: (1) Count I (IIED); (2) Count XIII (failure to protect);

(3) Count XV (state-created danger); (4) Count XVII (First Amendment retaliation); (5) Count XXI (substantive due process).

 An appropriate order follows.


May 13, 2019        /s/ A. Richard Caputo
Date             A. Richard Caputo
               United States District Judge